## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, 100 F. Street, NE Washington, D.C. 20549 | ) ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. _____ |
| v. | ) ) | |
| SIEMENS AKTIENGESELLSCHAFT Wittelsbacherplatz 2 D-80333 Munich Federal Republic of Germany | ) ) ) ) ) | |
| Defendant. | ) ) ) | |

## COMPLAINT

Plaintiff, U.S. Securities and Exchange Commission (the "Commission"), alleges:

### SUMMARY

1.      Between March 12, 2001 and September 30, 2007 (the "Relevant Period"), Siemens Aktiengesellschaft ("Siemens" or the "Company") violated the Foreign Corrupt Practices Act [15 U.S.C. § 78dd-1] (the "FCPA") by engaging in a widespread and systematic practice of paying bribes to foreign government officials to obtain business. Siemens created elaborate payment schemes to conceal the nature of its corrupt payments, and the Company's inadequate internal controls allowed the illicit conduct to flourish. The misconduct involved employees at all levels of the Company, including former senior management, and reveals a corporate culture that had long been at odds with the FCPA.

1

2.      During this period, Siemens made thousands of separate payments to third parties in ways that obscured the purpose for, and the ultimate recipients of, the money. At least 4,283 of those payments, totaling approximately $1.4 billion, were used to bribe government officials in return for business to Siemens around the world.  Among the transactions on which Siemens paid bribes were those to design and build metro transit lines in Venezuela; metro trains and signaling devices in China; power plants in Israel; high voltage transmission lines in China; mobile telephone networks in Bangladesh; telecommunications projects in Nigeria; national identity cards in Argentina; medical devices in Vietnam, China, and Russia; traffic control systems in Russia; refineries in Mexico; and mobile communications networks in Vietnam.  Siemens also paid kickbacks to Iraqi ministries in connection with sales of power stations and equipment to Iraq under the United Nations Oil for Food Program.  Siemens earned over $1.1 billion in profits on these fourteen categories of transactions that comprised 332 individual projects or individual sales.

3.      In November 2006, Siemens' current management began to implement reforms to the Company's internal controls.  These reforms substantially reduced, but did not entirely eliminate, corrupt payments.  All but $27.5 million of the corrupt payments occurred prior to November 15, 2006.

4.      Siemens violated Section 30A of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78dd-1] by making illicit payments to foreign government officials in order to obtain or retain business.  Siemens violated Section 13(b)(2)(B) of the Exchange Act by failing to have an adequate internal control system in place to detect and prevent the illicit payments.  Siemens violated Section 13(b)(2)(A) of

2

the Exchange Act by improperly recording each of those payments in its accounting books and records.

## JURISDICTION

5.      This Court has jurisdiction over this action under Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa]. Siemens, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

6.      Venue is appropriate in this Court under Section 27 of the Exchange Act [15 U.S.C. § 78aa] or 28 U.S.C. § 1391(d).

## DEFENDANT

7.      Siemens is a German corporation with its executive offices in Munich, Federal Republic of Germany. Siemens is one of the world's largest manufacturers of industrial and consumer products. Siemens builds locomotives, traffic control systems and electrical power plants. The Company also manufactures building control systems, medical equipment and electrical components, and formerly manufactured communications networks. Siemens employs approximately 428,200 people and operates in approximately 190 countries worldwide. Siemens reported net revenue of $116.5 billion and net income of $8.9 billion for its fiscal year ended September 30, 2008.

8.      In accordance with German law, Siemens has a Supervisory Board and a Managing Board. The Supervisory Board is generally comparable to the board of directors of a corporation in the United States in that it oversees management but with

less oversight power under German law. The Managing Board -- or "Vorstand" – generally performs the duties and responsibilities of senior management of a corporation in the United States and includes the Company's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO").

9.      Prior to a recent reorganization, Siemens operated through a complex array of business groups and regional companies. The business groups are divisions within Siemens and are not separate legal entities. The regional companies are wholly- or partly-owned subsidiaries of Siemens. The thirteen principal business groups during the Relevant Period were: Communications ("COM"), Siemens Business Services ("SBS"), Automation and Drives ("A&D"), Industrial Solutions and Services ("I&S"), Siemens Building Technologies ("SBT"), Power Generation ("PG"), Power Transmission and Distribution ("PTD"), Transportation Systems ("TS"), Siemens VDO Automotive ("SV"), Medical Solutions ("MED"), Osram Middle East, Siemens Financial Services ("SFS"), and Siemens Real Estate ("SRE"). In 2008, Siemens reorganized the groups into three Sectors – Energy, Healthcare and Industry.

10.     Since March 12, 2001, Siemens' American Depository Shares have been registered with the Commission pursuant to Section 12(b) of the Exchange Act. [15 U.S.C. § 78l(b)]. Siemens' American Depository Shares trade on the New York Stock Exchange ("NYSE") under the symbol "SI."

## FACTS

**A.    Background**

11.     Siemens traces its origins to 1847 and for over 160 years has been one of the most successful conglomerate companies in Germany. After World War II, Siemens

4

had difficulty competing for business in many Western countries and responded by seeking business opportunities in certain less developed countries where corrupt business practices were common.

12.     During the pre-1999 period, *the first period*, bribery at Siemens was largely unregulated.  German law did not prohibit foreign bribery and allowed tax deductions for bribes paid in foreign countries.  Siemens was not yet listed on the NYSE and therefore was not subject to U.S. regulation. Undeterred by foreign laws that prohibited bribery, Siemens put several payment mechanisms in place, including the use of cash and off-books accounts, to make payments as necessary to win business.

13.     The term Nützliche Aufwendungen ("NA") or "useful expenditures" was a commonly used tax law term and was commonly listed on Siemens' cost calculation sheets to denote payments to third parties, including illicit payments to foreign officials. Though as a rule Siemens required two signatures on all major documents in accordance with an internal control known as the "four-eyes" principle, many exceptions to the rule were made to ensure quick access to cash to make illicit payments.

14.     Over time, Siemens developed a network of payment mechanisms designed to funnel money through third parties in a way that obscured the purpose and ultimate recipient of the funds.  On at least one project, bribes to high ranking government officials were arranged personally by a member of the Vorstand.  The success of Siemens' bribery system was maintained by lax internal controls over corruption related activities and an acceptance of such activities by members of senior management and the compliance, internal audit, legal and finance departments.

5

1.     **NYSE Listing**

15.     From 1999 to 2003, *the second period*, the Vorstand was ineffective in implementing controls to address constraints imposed by Germany's 1999 adoption of the Organization for Economic Cooperation and Development ("OECD") anti-bribery convention that outlawed foreign bribery. On February 15, 1999, the very day that Germany ratified the OECD Convention, the then-CEO of Siemens "expressed his concern at the number of criminal and other investigations into members of the Company," further noting that "[a]s the Board could possibly be held responsible for various offenses, it was important to take protective measures." However, bribery continued for years afterward.

16.     The Vorstand was also ineffective in meeting the U.S. regulatory and anti-bribery requirements that Siemens was subject to following its March 12, 2001, listing on the NYSE.

17.     The changes in the legal landscape caused by Germany's ratification of the OECD Convention and Siemens' listing on the NYSE should have put an end to bribery at Siemens. Unfortunately, they did not. Instead, a steady flow of improper payments continued to emanate from the Company, in large part because of certain actions and inactions taken by the Vorstand.

18.     For instance in mid-2000, as Siemens prepared for its NYSE listing, its legal department forwarded a memorandum to the Supervisory Board Chairman and CFO identifying certain off-books accounts. The memorandum made it clear that Siemens' accounts had to be maintained "in harmony with the principles of orderly accounting.

Otherwise sanctions are likely under criminal law." The Vorstand failed to act, and the off-books accounts continued to exist even after Siemens' NYSE listing.

19.     In addition, the Vorstand failed to adopt meaningful compliance measures, failed to adequately staff Siemens' compliance function and, at times, failed to adopt reasonable recommendations designed to enhance compliance procedures at the Company. As illustrated herein, many of the improper payments made by Siemens involved the use of business consultants and business consulting agreements to funnel illicit payments to third parties, including government officials. In April 2000, the Vorstand rejected a proposal by the Company's General Counsel to create a Company-wide list of business consultants and a committee to review these relationships. Although Siemens issued various principles and recommendations regarding business consultants, Siemens had no mandatory and comprehensive Company-wide rules in place governing the use of business consultants until June of 2005.

### 2.      Red Flags (Communications Group – Nigeria)

20.     From 2003 to 2006, the *third period*, members of the Vorstand failed to respond appropriately to indications that bribery was widespread at Siemens. Red flags that the Vorstand members missed or ignored included substantial cash payments in Nigeria by senior level employees within the COM business group. In the fall of 2003, Siemens' outside auditor KPMG identified €4.12 million in cash that was brought to Nigeria by COM employees and flagged the payments for review. A compliance attorney at the Company conducted a one-day investigation of the payments and wrote a report indicating that COM employees admitted that it was not an isolated event and warned of numerous possible violations of law. Though the compliance report was

reviewed in November 2003 by Siemens' then-CFO, no disciplinary action was taken, no

further investigative work was conducted, and the report was not provided to or discussed

with the Vorstand as a whole or the Company's audit committee. COM employees

identified in the report, including a former COM manager, continued to pay bribes

through a series of slush funds until at least November 2006, when they were arrested

following a raid of Siemens' offices (the "Dawn Raid") by criminal authorities in

Munich, Germany. Had senior management responded differently, bribes paid by the

COM group could have been reduced or eliminated.

### 3.    Red Flags (Power Generation Group - Italy)

21.    During the *third period*, the Vorstand also failed to respond appropriately

to multi-million dollar bribes paid in Italy by managers of the Siemens PG business

group. In July 2003, the news media reported that prosecutors in Milan were

investigating bribes paid to employees of ENEL, an energy company partly-owned by the

Italian government, in connection with two power plant projects. Siemens PG managers

made approximately €6 million in corrupt payments to two ENEL officials. The corrupt

payments were routed through slush funds in Liechtenstein using a Dubai-based business

consultant.

22.    In April 2004, a judge in Milan issued a written opinion concluding that

the evidence indicated that Siemens viewed bribery "at least as a possible business

strategy." In or around May 2004, a legal memorandum concerning the ruling was sent

to members of the Vorstand, including the then-CEO and then-CFO of the Company.

Another memorandum, sent to members of the Vorstand, including the then-CEO and the

then-CFO in April 2004, detailed severance packages that had been given to the PG

managers and attached a September 2003 memorandum prepared by an American law firm. The legal memorandum suggested that Siemens should immediately review and assure proper functioning of its FCPA compliance program, that the allegations and steps taken to address them should be reported to the board, and that the employees involved should be disciplined.

23.     Subsequently, Siemens, along with two of its PG managers, entered into a plea bargain with criminal authorities in Italy pursuant to which Siemens paid a €0.5 million fine, gave up €6.2 million in profits and was barred from selling gas turbines in Italy for one year. Despite their criminal conduct, the two PG managers involved in the ENEL matter received early retirement with full retirement benefits. The PG CFO received a €1.8 million severance package from Siemens when he left the Company as a result of the ENEL matter. In a related criminal proceeding in Germany, the longtime CFO of PG confessed to authorizing the bribes. Siemens' corporate response to bribery assured certain employees that they could expect to be taken care of if and when caught paying bribes on behalf of the Company.

24.     There were additional significant red flags of corruption including admissions of bribery or so called "bonus payments" to government officials in March 2006 by a manager at Siemens Greece of over €37 million, as well as an April 2006 KPMG audit identification of over 250 suspicious payments made through an intermediary on behalf of Information and Communication Mobile, a corporate predecessor of COM, and Siemens S.p.A in Italy.

### 4.   Tone at the Top

25.   The Vorstand's response to the situations in Nigeria and Italy demonstrated a tone at the top of Siemens that was inconsistent with an effective FCPA compliance program and created a corporate culture in which bribery was tolerated and even rewarded at the highest levels of the company.

26.   Siemens implemented certain improvements to its compliance program in response to the situation in Italy. These included an anti-bribery speech delivered by the then-CFO to high-level business managers in summer 2004 and the establishment of a Corporate Compliance Office in October 2004. In addition, the Company issued policies over bank accounts, including requirements relating to the initiation and use of Company accounts and authorizations regarding cash. However, it was not until one year later, in June 2005, that the Company issued mandatory rules governing the use of business consultants, e.g. prohibiting success fees and requiring compliance officers to sign off on business consulting agreements. While these measures appear to have been partially effective, improper payments continued at least until the Dawn Raid in November 2006.

27.   Despite the Vorstand's knowledge of bribery at two of its largest groups - COM and PG - the Corporate Compliance Office continued to have a conflicted mandate and lacked resources. There was an inherent conflict in the Corporate Compliance Office mandate, which included both defending the Company, and preventing compliance breaches. The Corporate Compliance Office was significantly understaffed, with a part-time Chief Compliance Officer, and up to six full-time lawyers until 2007. Despite knowledge of numerous instances of corruption in multiple areas of the business, the Company did not implement mandatory FCPA compliance training until 2007.

**B.     Illicit Payment Mechanisms Used to Pay Bribes**

28.     During the Relevant Period, Siemens made thousands of payments to third

parties in ways that obscured the purpose for, and ultimate recipient of, the money.  The

principal payment mechanisms used to facilitate illicit payments were business

consultants, payment intermediaries, slush funds, cash, and intercompany accounts.

29.     Through its use of business consultants and payment intermediaries,

Siemens funneled more than $982.7 million to third parties, including government

officials.  All but $27.5 million of the payments were made prior to November 15, 2006.

Business consultants were typically hired pursuant to business consultant agreements,

contracts that on their face obligated Siemens to pay for legitimate consulting services.

In reality, many business consultant agreements were shams in that the business

consultants performed no services beyond funneling bribes.  PG had specific instructions

on how to use a "confidential payment system" to conceal payments to business

consultants.  Payment intermediaries were additional entities and individuals through

which Siemens funneled bribes.  In many cases, Siemens would pay the intermediary an

amount and simultaneously direct that the money be transferred to a third-party bank

account, less a small portion as the intermediary's fee.

30.     Siemens also funneled more than $211 million through slush funds for use

as bribes.  All but $2.3 million of the payments were made prior to September 30, 2004.

Slush funds were bank accounts held in the name of current or former senior Siemens

employees, third parties, or affiliated entities.  The most notable slush funds were

maintained by a former COM manager recently convicted in Germany for his role in the

11

payment of bribes to foreign officials, which included several slush funds held in the name of U.S. shell companies.

31.     Siemens also used cash and cash equivalents to funnel more than $160.4 million to third parties. All but $9.2 million of the payments were made prior to September 30, 2004. Siemens COM employees used cash desks maintained by the Siemens Real Estate Group to obtain large amounts of cash to pay bribes. Often, employees would obtain hundreds of thousands of dollars and, at times, even $1 million in various currencies from the cash desks in Germany. The cash was transported, sometimes in suitcases, across international borders into various countries. At times, the cash was then stored in safes maintained by Siemens employees to ensure ready access to cash to pay bribes.

32.     Lastly, Siemens used various types of internal accounts to funnel more than $16.2 million to third parties. Approximately 99% of the payments were made prior to September 30, 2005. An intercompany account is a type of Siemens' internal account that is used to make payments on transactions between two Siemens entities, i.e., for entity to entity business. Siemens used the intercompany accounts to make third party payments and in a number of instances, Siemens maintained the accounts in the names of unconsolidated entities around the globe, including Ecuador and Nicaragua, in order to avoid detection. Some of the intercompany accounts maintained at unconsolidated entities were known to, and possibly created by, a former member of the Vorstand, who had oversight responsibility for Latin America.

33.     As early as 2004, a Siemens Corporate Finance Financial Audit employee raised concerns about the use of intercompany accounts. He was phased out of his job

and assigned to work on "special projects" from his home until leaving the Company in
2005. Siemens thereafter began closing some of the accounts and eventually closed all of
them.

34.     Another type of internal account that employees abused was Siemens
MED internal commission accounts. These balance-sheet accounts were intended to be
used to record commissions MED earned on transactions with other Siemens entities.
These accounts were used to make third party payments. Many of the intercompany
account payments and the MED internal commission account payments were done
manually to bypass Siemens' automated payment system. The manual payments,
executed through SFS, did not require the submission of documentation in support of a
payment.

35.     Siemens used a host of other schemes to make more than $25.3 million in
payments to third parties. In particular, Siemens used sham supplier agreements,
receivables and other write-offs to generate payments.

**C.     Breakdown of Third Party Payments**

36.     During the Relevant Period, Siemens made 4,283 separate payments
totaling approximately $1.4 billion to bribe government officials in foreign countries
throughout the world. An additional approximately 1,185 separate payments to third
parties totaling approximately $391 million were not properly controlled and were used, at
least in part, for illicit purposes, including commercial bribery and embezzlement. The
following chart breaks down the $1.4 billion in illicit payments to foreign government
officials by business group.

| Business Group | Bribes to Foreign Officials | |
|---|---|---|
| | Number of Payments | $Millions |
| Communications (COM) | 2,505 | $813.9 |
| Industrial Solutions (I&S) | 89 | $22.5 |
| Medical Solution (MED) | 705 | $92.6 |
| Power Generation (PG) | 353 | $208.7 |
| Power Transmission PTD) | 356 | $148.2 |
| Transportation Systems (TS) | 154 | $70.0 |
| Other | 121 | $44.8 |
| **Total** | **4,283** | **$1,400.7** |

**D.    Bribery of Government Officials**

37.    The following paragraphs provide examples of bribery schemes involving projects and individual sales carried out by Siemens using U.S. means during the Relevant Period with profits of over $1.1 billion.

**1.    Metro Transit Lines in Venezuela**

38.    Between 2001 and 2007, Siemens TS and Siemens S.A., a regional company in Venezuela, paid an estimated $16.7 million in bribes to Venezuelan government officials in connection with the construction of metro transit systems in the cities of Valencia and Maracaibo, Venezuela.  The two projects, Metro Valencia and Metro Maracaibo, generated approximately $642 million in revenue to Siemens.  The Metro Valencia project was awarded to a TS entity in the United States and later transferred to Siemens, and the Metro Maracaibo project was awarded to Siemens and

14

part of the work was assigned to the U.S. TS entity. Each of the contracts was financed in part by the U.S. Export-Import Bank in Washington, D.C. The corrupt payments were made using four separate, overlapping payment schemes.

39.     Under the first scheme, Siemens maintained a numbered, off-books bank account in Panama and either maintained a similar account in Miami or had contacts to a banker in Miami who had access to such accounts. These accounts were controlled by two CEOs and two CFOs of Siemens' regional subsidiary in Venezuela. One of the regional CFOs estimated that between 2001 and 2003 he paid $5 to $6 million per year out of the accounts, a portion of which went to government officials in support of the Venezuelan projects. The regional CFO periodically destroyed the account statements.

40.     Under the second scheme, Siemens paid over $6.8 million to four U.S.-based entities controlled by a longtime Siemens business consultant. Siemens called upon the consultant, known as a political "fixer" in Venezuela and who had been an advisor to former Venezuelan presidents, to ensure political support for the Maracaibo and Valencia projects and for Siemens' role in them. Siemens made payments into the U.S. bank accounts of the four controlled entities pursuant to sham consulting agreements in return for no legitimate work. Bank records reveal payments to Venezuelan government officials and politically-connected individuals, including a high-ranking member of the central government, two prominent Venezuelan attorneys acting on behalf of government officials, a former Venezuelan defense minister and diplomat, and a relative of a local politician, all of whom had influence over these and other Siemens contracts in Venezuela. Siemens transferred an additional $4.9 million to one of the

controlled entities between 2006 and 2007 by artificially inflating the terms of a contract with a U.S. engineering firm.

41.     Under the third scheme, Siemens used a Cyprus-based business consultant as an intermediary to fund up to $2.5 million in bribe payments on the Valencia project. Sham agreements were entered into with the business consultant that purported to be for other Siemens projects, but were actually designed to transfer money to Valencia. This payment scheme was authorized by a former CFO of the Turnkey Division within the TS group at Siemens.

42.     Under the fourth scheme, Siemens in 2002 and 2003 entered into a sham agreement with a Dubai-based business consultant to supply Metro Maracaibo with approximately $2.6 million in workshop equipment. The equipment was actually supplied by another supplier, and the business consultant did not supply any goods under the contract. After the business consultant came under suspicion as a result of its involvement in the investigation of possible bribes paid to ENEL managers in Italy, the CFO of Siemens' Turnkey Division's successor was ordered to terminate the contract. Instead, the new CFO arranged the assignment of the contract to another Dubai-based business consultant that continued the sham workshop equipment arrangement.

### 2.     Metro Trains and Signaling Devices in China

43.     Between 2002 and 2007, Siemens TS paid approximately $22 million to business consultants who used some portion of those funds to bribe foreign officials in connection with seven projects for the construction of metro trains and signaling devices on behalf of government customers in China. The total value of the projects was over $1 billion. After experiencing difficulty breaking into the modern Chinese market, Siemens

began using a Hong-Kong based business consultant and related entities to pay bribes to influence the award of contracts to Siemens. Siemens typically hired the business consultant based on an oral agreement to pay a success fee equal to a percentage of the project value and would enter into a written business consulting agreement after the government contract was awarded to Siemens. In connection with one Shanghai project, four wholly-owned subsidiaries of the Hong Kong business consultant submitted invoices totaling $11.7 million to Siemens and requested payment routed through a U.S. correspondent bank and then to various Swiss accounts. The illicit arrangement was entered into by a Sales & Marketing manager, who later became a Vice President of Siemens TS in China with the knowledge and approval of his supervisors. There were few, if any, legitimate services provided by the business consultant; backdated agreements and phony work product were used to support at least some of the payments. E-mails relating to a variety of projects indicate that the business consultant was funneling money to government officials and "friends" with inside information and influence over government contracting decisions.

### 3.   **Power Plants in Israel**

44.      Between 2002 and 2005, Siemens PG paid approximately $20 million in bribes to a former Director of the state-owned Israel Electric Company ("IEC"). The bribes were paid in connection with four contracts to build and service power plants in Israel. The total value of the contracts was approximately $786 million. Siemens routed the corrupt payments through a business consultant owned and managed by the brother in-law of the CEO of Siemens Israel Limited, a regional subsidiary. The business consultant was ostensibly paid to "identify and define sales opportunities, provide market

intelligence," and support contract negotiations. In reality, the business consultant was a Hong Kong-based clothing company with no expertise in the power generation industry. The business consultant never provided the services called for under its business consultant agreement.

45.     Some of the money paid to the business consultant was traced to the former IEC Director, who was in a position to influence the award of the contracts won by Siemens. A portion of the funds passed through U.S. bank accounts.

**4.      High - Voltage Transmission Lines in China**

46.     Between 2002 and 2003, Siemens PTD paid approximately $25 million in bribes to government customers in connection with two projects for the installation of high voltage transmission lines in South China. The total value of the projects was approximately $838 million. The payments were funneled through multiple intermediaries, including a Dubai-based business consulting firm controlled by a former Siemens PTD employee and then paid to several entities associated with a Chinese business consultant who held a U.S passport and maintained a U.S. residence. Payments to the Dubai-based business consultant were supported by phony distribution contracts. Senior management of PTD in Germany approved the payments with the understanding that they would be shared with "partners" in China, including government officials. In 2002, Siemens used U.S. banks to funnel $1.2 million in bribes to another business consultant whose principal shareholders held U.S. passports. That business consultant also entered into a sham business consultant agreement with Siemens under which no legitimate services were provided.

### 5.     Mobile Telephone Services in Bangladesh

47.     Between 2004 and 2006, Siemens COM paid approximately $5.3 million in bribes to government officials in Bangladesh in connection with a contract with the Bangladesh Telegraph & Telephone Board ("BTTB") to install mobile telephone services.  The total value of the contract was approximately $40.9 million.  The payments were made to three business consultants pursuant to sham agreements calling for services associated with the mobile telephone project.  The ultimate recipients of the payments included the son of the then-Prime Minister in Bangladesh, the Minister of the Ministry of Posts & Telecommunications in Bangladesh, and the BTTB Director of Procurement.  In addition, Siemens Limited Bangladesh, a regional company, hired relatives of two other BTTB and Ministry of Post and Telecom officials.  Most of the money paid to the business consultants was routed through correspondent accounts in the United States, with at least one payment originating from a U.S. account.  Since approximately September 2004, a Siemens business consultant who served as a principal payment intermediary on the Bangladesh bribe payments has been resident in the United States.  At least $1.7 million of the bribe payments made through this intermediary were paid into a Hong Kong bank account while the intermediary was residing in the United States.

48.     The involvement of senior officials at Siemens' regional company in Bangladesh, including a former CEO and the director of the regional company's COM division, in the bribery scheme is revealed both in statements by the officials and in internal email messages, several of which include the tagline, "kindly delete this mail once the purpose is done."

### 6.    Four Telecommunications Projects in Nigeria

49.    Siemens COM made approximately $12.7 million in suspicious payments in connection with Nigerian projects, with at least $4.5 million paid as bribes in connection with four telecommunications projects with government customers in Nigeria, including Nigeria Telecommunications Limited and the Ministry of Communications. The total value of the four contracts was approximately $130 million.  The practice of paying bribes by Siemens COM in Nigeria was long-standing and systematic.  According to a high ranking official within Siemens Limited Nigeria, a regional company, corrupt payments in 2000 and 2001 commonly reached 15 to 30% of the contracts' value.  Bribe payments were typically documented using fictitious business consultant agreements under which no actual services were performed.  The CEO of Siemens Limited Nigeria forwarded requests for "commission" payments to Siemens headquarters in Germany. The illicit payments were then made through a number of means, frequently including large cash withdrawals from cash desks that were then hand-carried in suitcases to Nigeria.

50.    In the four telecommunications projects, approximately $2.8 million of the bribe payments was routed through a bank account in Potomac, Maryland, in the name of the wife of a former Nigerian Vice President.  The Vice President's wife, a dual U.S.-Nigerian citizen living in the United States, served as the representative of a business consultant that entered into fictitious business consultant agreements to perform "supply, installation, and commissioning" services but did no actual work for Siemens.  The purpose of these payments was to bribe government officials.  Other corrupt payments included the purchase of approximately $172,000 in watches for Nigerian officials

designated in internal Siemens records as "P." and "V.P.," likely referring to the

President and Vice-President of Nigeria.

### 7.     Identity Card Project in Argentina

51.      Between 1998 and 2004, Siemens paid over $40 million in bribes to senior

officials of the government of Argentina in an effort to secure a $1 billion project to

produce national identity cards.  Siemens officials between 1998 and 1999, including the

then-CEO of Siemens regional company in Argentina, Siemens S.A., caused $19 million

to be paid to business consultants for bribes.  At least $2.6 million was transferred from

the business consultants' accounts directly to the President of Argentina, the Minister of

the Interior, and the Head of Immigration Control to obtain the contract.  During this

period, Siemens officials promised to pay an additional $30 million or more to the

President and his Cabinet ministers.  In late 1999, the Argentine President ended his term

when his party was voted out of office, and the new administration threatened to

terminate the contract on the ground that it had been procured by fraud.  In an effort to

head off that possibility, Siemens paid $6 million in additional bribes to officials in the

new Argentine administration.  Despite these payments, the contract was nonetheless

canceled in May 2001.

52.      Over the following four years, Siemens officials received a series of

payment demands and threats against its employees in Argentina if it did not fulfill its

past commitment to pay additional bribes.  Between 2002 and 2004, Siemens paid over

$23 million to settle these demands.  The Siemens officials involved in authorizing the

payments included a member of the Vorstand, who in 2003 personally flew to the United

States to meet with Siemens' principal intermediary to negotiate the payment terms, as

well as the CEO and CFO of Siemens' regional company in Argentina. Approximately

$9.5 million of these payments were routed through the books of an unrelated PTD

transmission project in China in an effort to conceal the payments from Siemens' internal

auditors. Other payments were made through U.S. bank accounts based on fictitious

invoices for non-existent past services in connection with the identity card project and

other projects in the region, including payments to a former government Minister and

member of the Argentine Congress.

### 8.   Medical Devices in Vietnam

53.     Siemens MED paid $183,000 in early 2005 and $200,000 in early 2006 in

connection with the sale of approximately $6 million of medical devices on two projects

involving the Vietnamese Ministry of Health. After learning that bribe payments were

required in Vietnam, Siemens MED sought the name of the business consultant entrusted

by Siemens TS to conduct business in that market, including making its bribe payments.

Siemens MED then entered into an agreement with an affiliate of the group of Hong-

Kong based business consultants used by Siemens TS to act as Siemens MED's payment

intermediary. The payments were routed through a U.S. correspondent bank and then to

Singapore bank accounts of the Hong Kong business consultant. The amounts were then

withdrawn in cash and transported to Vietnam. Project calculation sheets connected to

the sales describe the payments to the intermediary as relating to "room preparation." A

number of Siemens senior managers, including the then-CFO of Siemens' business in

Vietnam, admitted that the purpose of the payments was to bribe government officials.

54.     With regard to the $183,000 payment that was made in early 2005, the

former CFO of Siemens Limited Vietnam ("SLV") described how he and the then CEO

of Siemens SLV picked up an envelope with $183,000 cash at a hotel in Singapore "from

a Hong Kong business man" and flew to the Hanoi airport where the money was left with

the then-head of Siemens MED in Vietnam, who had primary responsibility for contract

negotiations with officials at the Vietnamese Ministry of Health.

### 9.   **Medical Devices in China**

55.     Between 2003 and 2007, Siemens MED paid approximately $14.4 million

in bribes to the same intermediary described above in connection with $295 million in

sales of medical equipment to five Chinese-owned hospitals, as well as to fund lavish

trips for Chinese doctors. The former controller of Siemens oversaw the business

relationship between Siemens and the affiliate of the Hong-Kong-based intermediary that

it used to pay the bribes. A majority of the sales on which the intermediary received a

payment involved a bribe to a government official. The same intermediary was used by

Siemens TS to pay bribes in China and by Siemens MED to pay bribes in Vietnam.

56.     For example, Siemens paid $64,800 in May 2006 in connection with the

sale of a $1.5 million MRI system to the Songyuan City Central Hospital in China. The

payment was sent to a U.S. bank account, and later routed to a Singapore bank account in

the name of the intermediary. A project calculation sheet signed by the then-CFO of

Siemens Limited China, a regional company, described the payment as relating to

"expenses (commission)"; however, no services were provided by the intermediary aside

from acting as a vehicle for the transfer of bribe payments. In or around March 2008,

Songyuan Hospital's deputy director and head of the radiology department was convicted

in China of corruption charges, including a charge for accepting a $60,000 bribe from a

Siemens salesperson in connection with the sale of the MRI system and sentenced to fourteen years in prison.

57.     Siemens also used the Hong Kong intermediary to pay $9 million in travel costs for "study trips" taken by doctors who worked at government-owned hospitals in China. The study trips, which included lavish trips to Las Vegas, Miami, and other vacation spots in the United States, were connected to at least 231 separate sales to hospitals awarded to Siemens with revenue of approximately $235 million. The former CFO of Siemens MED in China used the intermediary to pay for study trips because of concerns about the lavishness and "non-scientific content" of the trips, which were taken by doctors who were in a position to award business to Siemens.

58.     Bribes were also paid to secure sales of medical equipment to hospitals in China on behalf of two Siemens U.S.-based subsidiaries, Oncology Care Solutions ("OCS") in California and Molecular Imaging ("MI") in Illinois. For OCS, Siemens developed a scheme to minimize the risk of anti-bribery prosecution in the United States for these transactions by routing the approval of business consulting agreements and the payment of business consultants through Siemens' headquarters in Germany rather than in the United States. Between 1998 and 2004, this scheme was used to approve improper payments of approximately $650,000 to Chinese business consultants in connection with the U.S.-related sales. A senior manager at Siemens MED in Germany and officials of the U.S.-based subsidiaries, including the CFOs of OCS and MI were aware of the business consultant payments and facilitated the scheme by verifying the amounts to be paid and that the payments were due and owing. At one point after approving twenty-six such payments, the senior manager at Siemens MED refused to continue the payment

scheme, citing concern for the welfare of his family if he were sent to prison. The CFO of MED attempted to pressure the senior manager to keep the payment.scheme going, but without success.

59.     In 2005, these officials also verified that "clean up" payments totaling over $500,000 were owed to Siemens' Hong Kong-based intermediary in connection with sales by OCS and MI in China. The outstanding payments were for bribes owed to third parties on behalf of Siemens. After receiving confirmation from OCS and MI that the payments were outstanding, the former controller of Siemens Med authorized three "clean up" payments in 2005 for $377,400, $140,000 and $44,000.

### 10.     **Traffic Control System in Russia**

60.     From 2004 to 2006, Siemens I&S and OOO Siemens, a regional company in Russia, paid approximately $741,419 in bribes to government officials in connection with a World Bank-funded project for the design and installation of a $27 million traffic control system in Moscow called the Moscow Third Ring Project. First, Siemens paid money to its business consultant who simultaneously worked as a technical consultant for the Moscow Project Implementation Unit (the "MPIU"), a quasi-governmental unit that ran the Moscow Third Ring project. The MPIU hired the technical consultant at Siemens' suggestion. From 2004 to 2006, Siemens paid approximately $313,000 to three entities associated with the technical consultant, with at least $141,419 of the payment in exchange for favorable treatment in the tendering process. The technical consultant used his position at the MPIU to create tender specifications favorable to Siemens, to provide tender documents to Siemens before their official publication, to evaluate project bids in

a way that ensured Siemens would win the contract, and to assist during the implementation phase of the project.

61.    Second, Siemens colluded with a competitor who agreed to inflate its project bid to ensure Siemens won the project. In return, Siemens hired the competitor at an inflated rate of approximately $800,000. Siemens also hired two of the competitor's former consortium members to become subcontractors to Siemens on the project ("Subcontractor A and Subcontractor B"). Siemens paid Subcontractor A approximately $1.3 million for a sham traffic study and approximately $1.4 million to Subcontractor B for other alleged services. In fact, both subcontractors were used to funnel at least $600,000 of the $741,419 described in paragraph 60 to senior officials of the MPIU.

## 11.    Refinery Modernization Project in Mexico

62.    In late 2004, Siemens PG and Siemens S.A. de CV, a regional entity, made three separate illicit payments totaling approximately $2.6 million to a politically-connected business consultant to assist in settling cost overrun claims in connection with three refinery modernization projects in Mexico. Some portion of these payments were routed through the business consultant to a senior official of the Mexican state-owned petroleum company, Petroleos Mexicanos ("Pemex"). The official was in a position to influence the settlement. The payments were made with the knowledge and approval of the then-CEO of Siemens' regional company in Mexico. The payments were supported by invoices reflecting consulting services that were not provided or only vaguely described. A portion of Siemens' work on the contracts was performed by a regional subsidiary in Atlanta, and some of the contract financing was provided by the U.S. Export-Import Bank in Washington, DC.

### 12.  **Medical Devices in Russia**

63.     Between 2000 and 2007, Siemens MED made improper payments of over
$55 million to a Dubai-based business consultant in connection with sales of medical
equipment in Russia.  The business consultant was used as a payment intermediary for
bribes to government-owned customers in Russia.  The former CFO of Siemens MED
knew of and approved the payments.  Senior Siemens officials estimated that up to 80%
of Siemens' MED business in Russia involved illicit payments.  On one such transaction
in 2006, Siemens made payments of approximately $287,914, some of which was used
for bribes, in connection with the $2.5 million sale of a computer tomograph system to a
public hospital in Ekaterinburg.  On this contract, the bribes were routed through the
Dubai-based business consultant, as well as a second business consultant that was
registered in Des Moines, Iowa.

### 13.  **GSM Mobile Network Services in Vietnam**

64.     In 2002, Siemens COM paid approximately $140,000 in bribes in
connection with a tender worth approximately $35 million for the supply of equipment
and services related to a Global Systems mobile network for Vietel, a government owned
telecommunications provider founded by the Vietnamese Ministry of Defense.  Two
separate payments totaling $140,000 were made to the Singapore account of a Siemens
business consultant.  The payments were then routed through a U.S. correspondent
account and likely paid to officials at the Vietnamese Ministry of Defense.  The payments
were part of a much larger bribery scheme concocted by high-level managers at Siemens
regional company in Vietnam, SLV, to pay bribes to government officials at Vietel and
the Vietnamese Ministry of Defense in order to acquire Phase I of the Vietel GSM tender.

In a June 2002, facsimile that discussed the bribery scheme, the former head of COM sales for the regional company described Siemens' explicit agreement to pay 8% of the value of the Vietel project to officials at the Ministry of Defense and 14% of the project value to officials at Vietel. In August and September 2002, Siemens signed agreements with two business consultants who were retained for the sole purpose of funneling the bribes to government officials connected to Vietel. Ultimately, Siemens was unsuccessful in its pursuit of the Vietel project and lost the tender before paying additional bribes.

**E.**    **The Oil for Food Program**

65.    The Oil for Food Program was intended to provide humanitarian relief for the Iraqi population, which faced severe hardship under the international trade sanctions that followed Iraq's 1990 invasion of Kuwait. The Program permitted the Iraqi government to sell its crude oil and use the proceeds to purchase food, medicine, and critical infrastructure supplies. The proceeds of the oil sales were transferred directly from the buyers to an escrow account (the "U.N. Escrow Account") maintained in New York by the United Nations 661 Committee. Funds in the U.N. Escrow Account were available for the purchase of humanitarian supplies, subject to U.N. approval and supervision. The intent of this structure was to prevent the proceeds of Iraq's crude oil sales from undermining the sanctions regime by supplying cash to Saddam Hussein.

66.    Corruption was rampant within the Program. By mid-2000, Iraqi ministries on the instruction of top government officials instituted a policy requiring suppliers of humanitarian goods to pay a ten percent kickback on each contract. This kickback requirement was euphemistically referred to as an "after-sales service" fee

("ASSF"); however, no services were provided. Suppliers competing to obtain contracts under the Program were encouraged to include a ten percent markup in their bids or purchase orders. The inflated contract prices were incorporated into the Oil for Food contracts as a way to permit the suppliers to recover from the U.N. Escrow Account the kickback payments they had paid secretly to Iraq. Following the 2004 release of a report by the U.S. General Accounting Office exposing some of the abuses, the U.N. commissioned an independent inquiry committee, headed by former Federal Reserve Chairman Paul Volcker (the "Volcker Committee"), to investigate the Program's performance. That committee's October 27, 2005, final report estimated that the Iraqi government had diverted $1.7 billion in illicit income from the Program.

### 1. Siemens' Involvement in the Oil for Food Program

67.     Siemens participated in the Program through two of its regional companies, Siemens S.A.S. ("Siemens France") and Siemens Sanayi ve Ticaret A.S. ("Siemens Turkey") and two subsidiaries, Osram Middle East FZE ("Osram ME") and Gas Turbine Technologies SpA ("GTT"). In total, 42 Oil for Food contracts were entered into, and secret kickback payments of approximately $1.7 million were made to Iraqi controlled accounts in order to avoid detection by the U.N. Total revenues on the contracts were over $124 million with profits of approximately $38,226,537. The payments were characterized as after sales service fees; however, no services were actually rendered. The ASSFs were effectively bribes paid to the Iraqi regime, which Siemens improperly disguised on its books and records by mischaracterizing the bribes as legitimate commissions.

### 2.   Siemens France

68.    From approximately September 2000 to July 2001, Siemens France entered into twelve contracts covering power station renovation, servicing and spare parts with the Iraqi Ministry of Electricity and paid illicit ASSFs of approximately $321,745. The contracts were artificially inflated by 10% and then submitted to the U.N. for payment. The U.N. was not informed that the contracts had been inflated or that Siemens France intended to pay illicit kickbacks to Iraq.

69.    For instance, in July 2000 Siemens submitted a bid for the refurbishment of cranes at the Daura Power Station in Iraq. The purchase order was subsequently signed in November 2000, and included a 10% increase in the contract value. Shortly thereafter, in January 2001, Siemens signed a Supplement to its business consultant agreement with its local agent in Iraq providing for a 10% commission to the agent for "after sales services and activities." The document was unusual because it provided a higher agent compensation than was usually provided on such contracts; it was "inconsistent with Siemens' practice" which required specification and pricing of any true after sales services; and because there was only one Siemens signatory on the contract. In various letters and memoranda, one former Siemens salesman documented discussions that he had with Iraqi officials regarding the requirement of ASSFs. In a memorandum written by another Siemens employee discussing how to make the ASSF payments, the employee stated that Siemens' agent in Iraq told him that another Siemens subsidiary, Siemens Turkey, had chosen to pay ASSFs in cash "so that no names appear on paper."

70.     Siemens France used a local agent in Iraq to deposit the ASSF payments

in cash into a Jordanian bank account held by two Iraqi officials, which were later

transferred to an account controlled by the Iraqi Ministry of Electricity. The local agent

confirmed the bank deposits were made on behalf of Siemens and bank records reflect the

payments. When making the ASSF payments, the local agent used the name of an

acquaintance who did not work for Siemens so as to conceal his true identity.

### 3.     Siemens Turkey

71.     From approximately September 2000 to June 2002, Siemens Turkey

entered into twenty contracts relating to the building and rehabilitation of power stations,

and paid after sales service fees totaling approximately $1,243,119. Many aspects of

Siemens Turkey's involvement in the Oil for Food Program were similar to those of

Siemens France. Both companies used the same local agent in Iraq and both dealt

principally with the Ministry of Electricity in their payment of illicit ASSFs. As

described above, a Siemens employee stated that the agent informed him that Siemens

Turkey was paying ASSFs in cash "so that no names appear on paper." Siemens' local

agent also deposited some ASSFs into a Jordanian bank account controlled by Iraqi

officials.

### 4.     Osram Middle East

72.     From approximately May 2000 to June 2002, Osram Middle East

("Osram"), a Siemens subsidiary, entered into six contracts with state companies within

the Ministry of Oil, and paid ASSFs of approximately $89,250 for the sale of lighting

equipment. Osram employees admitted that Siemens' local agent relayed the Ministry of

Oil's demand for ASSFs sometime in late 2000. On three of the contracts, Osram entered

31

into secret side agreements agreeing to pay a 10% kickback to the Iraqi ministry. The local agent signed each of the side letters on Osram's behalf. The contracts between Osram and the Ministry of Oil typically contained a 10% markup for ASSFs. The inflated contracts were submitted to the U.N. for approval, but the U.N. was not informed that the contracts were inflated and the side letters were not disclosed.   The agent admitted that he made the ASSF payments to Jordanian bank accounts held for the benefit of the Iraqi Ministry of Oil on Osram's behalf.

    **5.**    **GTT**

    73.    Beginning in 2001, GTT entered into four contracts with the Ministry of Electricity in which ASSFs of $81,962 were paid.   For each contract, the value of the contract was increased by approximately 10% between the submission of the initial bid and the signing of the purchase order. GTT employees admit to the ASSF kickback scheme, and documents reflect that GTT's agent in Iraq informed GTT that ASSF payments were a condition to obtaining contracts. Though all of the contracts were signed before 2003, none were performed before the start of the Iraqi war. After the war began, the U.N asked GTT to amend each contract to decrease its value by the 10% ASSF.

**F.**    **Siemens Employed U.S. Means to Engage in Bribery**

    74.    In total, Siemens made bribe payments directly or indirectly to foreign government officials in connection with at least 290 projects or individual sales involving business in Venezuela, China, Israel, Bangladesh, Nigeria, Argentina, Vietnam, Russia, and Mexico that employed the mails and other means and instrumentalities of U.S. interstate commerce. The corrupt payments were made to government officials or their

designees for the purpose of obtaining or retaining business in connection to the above

projects.  The use of interstate commerce in connection with bribery included involving

U.S.-based Siemens subsidiaries and their employees in the bribery schemes; financing of

three underlying projects by the World Bank and the U.S. Export-Import Bank; making

illegal payments through U.S. banks; using U.S.-based companies as intermediaries,

business consultants, and holders of slush funds; conducting meetings in the United

States in furtherance of a bribery scheme; and transmitting mail, electronic mail, and

facsimile messages into and out of the United States.

**G.**     **Siemens Failed to Maintain Its Books and Records**

75.     During the Relevant Period, Siemens made thousands of payments to third

parties in ways that obscured the purpose for, and the ultimate recipients of, the

payments.  In particular, Siemens paid approximately $1.4 billion in bribes to foreign

government officials.  Doing so involved the falsification of Siemens' books and records

by employees throughout the Company.  Specifically, Siemens failed to keep accurate

books and records by:  1) establishing and funding secret, off-books accounts;  2)

establishing and using a system of payment intermediaries to obscure the source and

destination of funds; 3) making payments pursuant to business consultant agreements that

inaccurately described the services provided; 4) generating false invoices and other false

documents to justify payments; 5) disbursing millions in cash from cash desks with

inaccurate documentation authorizing or supporting the withdrawals; 6) using post-it

notes for the purpose of concealing the identity of persons authorizing illicit payments;

7) recording illicit ASSF payments as legitimate commissions in Oil for Food

transactions; 8) falsifying U.N. documents in connection with the Oil for Food Program; and 9) recording bribes as payment for legitimate services.

**H.      Siemens Failed to Maintain Adequate Internal Controls**

76.      Siemens failed to implement adequate internal controls to comply with the Company's NYSE listing, including the detection and prevention of violations of the FCPA.  First, Siemens engaged in the knowing falsification of books and records. Siemens established numerous off-books accounts and secret slush funds for the purpose of obscuring the purpose for, and ultimate recipient of, illicit payments.  Elaborate payment mechanisms were used to conceal the fact that bribe payments were made around the globe to obtain business, including the PG confidential payment system and extensive use of business consultants and intermediaries to funnel bribes.  False invoices and payment documentation was created to make payments to business consultants under false business consultant agreements that identified services that were never intended to be rendered.  Illicit payments were falsely recorded as expenses for management fees, consulting fees, supply contracts, room preparation fees, and commissions.  Documents related to its participation in the Oil for Food Program were also inaccurate.  Siemens inflated U.N. contracts, signed side agreements with Iraqi ministries that were not disclosed to the U.N., and recorded the ASSF payments as legitimate commissions despite U.N., U.S., and international sanctions against such payments.

77.      Second, Siemens employees routinely circumvented the internal controls the Company had in place.  Slush funds were opened in the names of former and current employees and maintained off-books.  At any given point, Siemens had no central record of the true number of bank accounts opened on its behalf, from which, millions in illicit

payments were made. Despite a "four-eyes" policy that required two signatures on

Company documents to authorize transactions, a significant number of business

consultant agreements were entered into and a significant number of payments were

authorized in violation of the policy. In many instances, signatures authorizing the

withdrawal of hundreds of thousands of dollars from cash desks were placed on post-it

notes and later removed in order to eradicate any permanent record of the approvals. In

numerous instances, officials signing documents failed to conduct any review of the

documents. For example, an official who authorized payments on behalf of Siemens'

Russian regional subsidiary authorized payments despite his inability to read the

language in which the supporting documentation of the payments were prepared.

Siemens officials frequently misused internal accounts by transferring money from one

Siemens entity to another without any legitimate business purpose or proper

documentation of the disposition of the funds. Siemens officials modified the format of

agreements to avoid internal controls on the use of business consultants by backdating

agreements, misidentifying counterparties as "agents" rather than "business consultants,"

and obscuring the amounts paid to business consultants by splitting the payments among

separate agreements.

      78.     Finally, Siemens failed to establish adequate internal controls despite its

knowledge that corruption was rampant. Siemens did not issue mandatory and

comprehensive Company-wide controls regarding the use of business consultants until

June 2005, well after senior officials were aware of widespread bribery in the Company's

two largest divisions, COM and PG. Despite those controls, due diligence on business

consultants remained largely inadequate, and payments continued to be made without

adequate proof of services rendered. Siemens failed to establish controls over numerous

off-books accounts held on its behalf around the world. The Company maintained no

central list of corporate accounts held at unconsolidated entities or in the names of

individual Siemens officials. Siemens failed to establish controls over cash

disbursements, allowed manual payments without documentation, and failed to ensure the

proper use of intercompany accounts. Siemens failed to establish an effective central

compliance function. The compliance office lacked independence and was severely

understaffed. Siemens tone at the top was inadequate for a law abiding entity, and

employees engaged in bribery and other misconduct on behalf of the Company were not

adequately disciplined. Siemens also failed to conduct appropriate anti-bribery and

corruption training.

## **CLAIMS FOR RELIEF**

### **FIRST CLAIM**

[Violations of Section 30A of the Exchange Act]

Paragraphs 1 through 78 are realleged and incorporated by reference.

79.     As described above, Siemens, through its officers, agents, and

subsidiaries, corruptly offered, promised to pay, or authorized payments to one or more

persons, while knowing that all or a portion of those payments would be offered, given,

or promised, directly or indirectly, to foreign officials for the purpose of influencing their

acts or decisions in their official capacity, inducing them to do or omit to do actions in

violation of their official duties, securing an improper advantage, or inducing such

foreign officials to use their influence with foreign governments or instrumentalities

thereof to assist Siemens in obtaining or retaining business.

36

80.    By reason of the foregoing, Siemens violated, and unless enjoined will continue to violate, Section 30A of the Exchange Act. [15 U.S.C. § 78dd-1]

## SECOND CLAIM

### [Violations of Section 13(b)(2)(A) of the Exchange Act]

Paragraphs 1 through 80 are realleged and incorporated by reference.

81.    As described above, Siemens, through its officers, agents and subsidiaries, failed to keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected its transactions and dispositions of its assets.

82.    By reason of the foregoing, Siemens violated, and unless enjoined will continue to violate, Section 13(b)(2)(A) of the Exchange Act. [15 U.S.C. § 78m(b)(2)(A)]

## THIRD CLAIM

### [Violations of Section 13(b)(2)(B) of the Exchange Act]

Paragraphs 1 through 82 are realleged and incorporated by reference.

83.    As described above, Siemens failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions were executed in accordance with management's general or specific authorization; and (ii) transactions were recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for its assets.

84.    By reason of the foregoing, Siemens violated, and unless enjoined will continue to violate, Section 13(b)(2)(B) of the Exchange Act.  [15 U.S.C. § 78m(b)(2)(B)]

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

A.    Permanently restraining and enjoining Siemens from violating Sections 30A, 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act  [15 U.S.C. §§ 78dd-1, 78m(b)(2)(A), and 78m(b)(2)(B)];

B.    Ordering Siemens to disgorge ill-gotten gains wrongfully obtained as a result of its illegal conduct; and

C.    Granting such further relief as the Court may deem just and appropriate.

Dated: _Dec 12_, 2008

Respectfully submitted,

Cheryl J. Scarboro (D.C. Bar No. 422175)
Reid A. Muoio
Tracy L. Price
Denise Hansberry
Robert I. Dodge

Attorneys for Plaintiff,
U.S. Securities and Exchange Commission
100 F Street, NE
Mail Stop 6030 SPII
Washington, DC  20549-6030
(202) 551-4403 (Scarboro)